## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

JACK DAVID STOVALL, II,       )
                                      )

     Petitioner,           )
                                      )     **CV 02-B-8036-E**

     vs.                     )     **CR 97-B-0229-E**
                                        )

UNITED STATES OF AMERICA,   )
                                        )

     Respondent.        )

## <u>MEMORANDUM OPINION</u>

This case is presently pending before the court on petitioner's Motion for Reconsideration of Memorandum Opinion and Order and for Stay and Other Relief. (CV 02-B-8036-E, doc. 4.)[1] Petitioner takes issue with this court's Order adopting the Report and Recommendation of the Magistrate Judge that petitioner re-file his § 2255 Motion in a coherent, single document that contains all his grounds for relief. Upon consideration of the record, the submissions of the parties, and the relevant law, the court is of the opinion that petitioner's Motion for Reconsideration of Memorandum Opinion and Order and for Stay and Other Relief, (CV 02-B-8036-E, doc. 4), is due to be granted, and the petitioner's Motion

----

[1] Reference to a document number, ("Doc. ___"), refers to the number assigned to each document as it is filed in the court's record in petitioner's criminal case, CR 97-B- 0229-E. Reference to "(CV 02-B-8036, doc. ___)" refers to the number assigned to each document as it is filed in the court's record in petitioner's habeas case, CV 02-B- 8036-E.

to Vacate, Set Aside or Correct Federal Sentence Pursuant to 28 U.S.C. § 2255, (doc. 81), is due to be denied.[2]

Petitioner Jack David Stovall, II, filed a Motion to Vacate, Set Aside or Correct Federal Sentence Pursuant to 28 U.S.C. § 2255 seeking to set aside his conviction. (Doc. 81.) After the government responded, (*see* docs. 90 and 96), and petitioner replied, (*see* doc. 103), the Magistrate Judge ordered movant to file an Amended Petition that set forth all his grounds for relief and the factual basis supporting each ground without reference to other documents, (doc. 115). Petitioner was given thirty days to file the Amended Petition, (*id*.); this court's Memorandum Opinion and Order, adopting the Magistrate Judge's Report and Recommendation entered almost a year later, gave petitioner an additional fourteen days to file the Amended Petition, (CV 02-B-8036-E, doc. 2).

Petitioner contends that the time period – over one year – was too brief to allow him to complete the onerous task of telling the court his grounds for relief in the prescribed manner. Although the court finds that petitioner's contentions are not well taken, it

---

[2]As counsel for petitioner correctly pointed out in his Motion for Reconsideration,

[B]asic principles of justice . . . required a timely consideration and decision . . . to at least enable Mr. Stovall to seek review elsewhere within a meaningful time frame. Every citizen is entitled at least to the fair and timely consideration of his constitutional claims and . . . this Court clearly has failed to meet its obligation in that regard.

(CV 02-B-8036-E, doc. 4 at 4 n.4.) The court agrees. While firmly of the opinion that petitioner's § 2255 petition is due to be denied, counsel is absolutely correct that this case should have been ruled on in a much more timely fashion.

nevertheless acknowledges that too much time has passed without a decision on the merits of the petition.  Therefore, the court will grant the Motion to Reconsider, (CV 02-B-8036-E, doc. 4), and will consider the merits of the § 2255 Motion.

For the reasons set forth below, the court finds that the Motion to Vacate, Set Aside or Correct Federal Sentence Pursuant to 28 U.S.C. § 2255, is due to be denied.

## I.  <u>STATEMENT OF FACTS</u>

On July 31, 1997, the petitioner was indicted on five counts:

Count One – Violation of 18 U.S.C. § 1958(a) (alleging that, on July 11, 1997, petitioner had "cause[d] another to travel in interstate commerce with intent that murder be committed in violation of the laws of the State of Alabama as consideration for the receipt of and as consideration for a promise and agreement to pay a thing of pecuniary value").

Count Two – Violation of 18 U.S.C. § 924(c)(1) (alleging that, "during and in relation to a crime of violence," petitioner had "knowingly use[d] and carr[ied] a firearm,  . . . a .30 caliber carbine rifle").

Count Three – Violation of 18 U.S.C. § 922(g)(1) (alleging that petitioner, "after previously having been convicted of a [felony], [had] knowingly possess[ed] a firearm in and affecting commerce, that is a .30 caliber carbine rifle").

Count Four – Violation of § 18 U.S.C. § 922(g)(1) (alleging that petitioner, "after previously having been convicted of a [felony], [had] knowingly possess[ed] a firearm in and affecting commerce, that is a 9 mm FM High Power handgun").

Count Five – Violation of 18 U.S.C. § 1958(a) (alleging that, on June 25, 1997,  petitioner "cause[d] another to travel in interstate commerce with intent that murder be committed in violation of the laws of the State of Alabama as consideration for the receipt of and as consideration for a promise and agreement to pay a thing of pecuniary value").

3

(Doc. 1.)  On December 5, 1997, petitioner pled guilty to Counts One and Three pursuant to a plea agreement with the government.

At the plea hearing, the Government stated that it planned to offer evidence that petitioner had approached William Rhodes about murdering Barry Jackson, whom petitioner suspected had stolen jewelry from his house in exchange for money or a backhoe.  (Doc. 43 at 18, 21, 23.)  Thereafter Rhodes contacted the FBI and told it of petitioner's plans.  (*Id*. at 18.)  The FBI monitored a call from Rhodes to petitioner, during which Rhodes asked petitioner if he "still wanted him  . . . to do that thing for him."  (*Id*. at 23.)  Petitioner told him that he did.  (*Id*.)

A few days later, Rhodes traveled from Atlanta, Georgia to meet petitioner in Anniston, Alabama.  (*Id*.)  They were observed by law enforcement officers as they met in the parking lot of a convenience store.  (*Id*. at 24.)  During this time, Jackson pulled into the parking lot and was identified by petitioner.  (*Id*.)

Rhodes and petitioner left the parking lot, still under surveillance and were followed to Greenbriar apartments, where petitioner moved some items from one car to another.  (*Id*.)  Later he transferred three items – a rifle, a mask, and a black pouch – from the car to Rhodes's truck.  (*Id*. at 24-25.)  Law enforcement officers saw this activity.  (*Id*. at 25.)

Rhodes and petitioner then drove toward Jackson's house.  (*Id*.)  Law enforcement officers stopped them about a block from Jackson's house, and they recovered the rifle and the mask.  (*Id*. )  Petitioner was arrested.  (*Id*. at 26.)  During a subsequent search of the car

4

at Greenbriar, a nine millimeter handgun, $120,000, and an ammunition clip that matched the rifle in petitioner's possession at the time of his arrest were found.

At the time of his arrest, petitioner had been convicted of more than one felony. (*Id.* at 27.)

At his guilty plea hearing, petitioner objected to certain facts as untrue.  However, when specifically asked, petitioner admitted that he had "cause[d] Mr. Rhodes to come [to Alabama from Georgia] with the offer by [petitioner] to pay [Rhodes] money to assist in committing murder;"  that he had "in [his] possession a .30 caliber Carbine rifle;"' and that he "had . . . been convicted of a felony offense." (*Id.* at 28.)

At the sentencing hearing, petitioner disputed the fact that, at the time of his arrest, he was going to kill Jackson personally, (doc. 44 at 6-7, 9); however, he did not dispute the fact that he had hired Rhodes for the purpose of killing Jackson, (*id.* at 9).  He also stated that his motive for the crime was extortion and threats to his children, not revenge for the robbery. (*Id.* at 25-26, 30.)

The court sentenced petitioner to a term of imprisonment of 210 months. (*Id.* at 38.) The sentence was amended to 108 months on petitioner's Motion for Reconsideration. (Doc. 49.)

Petitioner appealed his conviction and sentence, which were affirmed. (Doc. 79.)

5

## II. <u>DISCUSSION</u>

This court had ordered petitioner to file an amended petition setting forth his claims for relief without reference to the other documents. Petitioner filed a Motion to Reconsider, stating that the task was too onerous and that the court should address his underlying claims. The court finds that petitioner's Motion to Reconsider is due to be granted. As set forth below, the court has considered petitioner's claims for relief and finds they are without merit. Therefore, the court will deny his § 2255 Motion for relief.

## A. INEFFECTIVE ASSISTANCE OF COUNSEL

The Eleventh Circuit recently restated the well-established standards for determining whether counsel provided ineffective assistance:

> To satisfy the *Strickland* [*v. Washington*, 466 U.S. 668 (1984)] standard for ineffective assistance, a criminal defendant must demonstrate that (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Chandler v. United States*, 218 F.3d 1305, 1312-13 (11th Cir. 2000)(*en banc*)(citations and internal quotation marks omitted).
>
> In satisfying the deficiency element, the defendant must show that his counsel's performance was objectively unreasonable – "that no competent counsel would have taken the action that his counsel did take." *Id*. at 1315. In deciding whether the defendant has met this burden, courts must "'indulge [the] strong presumption' that counsel's performance was reasonable." *Id*. at 1314 (quoting *Strickland*, 466 U.S. at 689-90). To meet the requisite burden for the prejudice element, the defendant must show that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt . . . . *Strickland*, 466 U.S. at 695.

*Gilliam v. Secretary for Dept. of Corrections*, No. 05-16638, 2007 WL 654269, *4 (11th Cir.

Mar. 6, 2007).  "[I]n considering claims of ineffective assistance of counsel, '[the court]

address[es] not what is prudent or appropriate, but only what is constitutionally compelled.'"

*Burger v. Kemp*, 483 U.S. 776, 794 (1987)(quoting *United States v. Cronic*, 466 U.S. 648,

665 n.38 (1984).  Also, "a review of ineffective assistance of counsel claims must be made

from the perspective of defense counsel, taking into account all circumstances of the case as

they were known to counsel at the time of the representation." *United States v. Teague*, 953

F.2d 1525, 1535 (11th Cir. 1992)(citing *Porter v. Wainwright*, 805 F.2d 930 (11th Cir.

1986), *cert. denied*, 482 U.S. 918 (1987)).[3]   Considering each of petitioner's allegations

separately, as discussed below, or collectively, the court finds that petitioner has not offered

evidence sufficient to conclude that his counsel's representation – both before the trial court

and on appeal – fell below an objective standard of reasonableness, nor has he demonstrated

a reasonable probability that, but for counsel's alleged unprofessional errors, the result of the

proceedings would have been different

### 1.  Failure to Investigate

Petitioner contends:

[D]espite Mr. Stovall having told his attorneys that the charges against him
were a complete fabrication and were the product of a scheme orchestrated by
Rhodes, and notwithstanding the 'red flags' already sent up by statements the
prosecutor made to the defense lawyers, the attorneys did only the most

---

[3]The court noted on the record at petitioner's sentencing that his attorneys, William
Broome and Richard Jaffe are "outstanding" criminal defense attorneys.  (Doc. 44 at 23.)

> cursory investigation concerning Rhodes and did not even scratch the surface
> as to the liability the government would have faced if it had called Rhodes as
> a witness.

(Doc. 103 at 11-12 [footnote omitted].)

Petitioner's attorneys – Richard Jaffe, William Broome, and Derek Drennan – did a "very extensive" investigation regarding Rhodes.  (Doc. 107, Ex. A at 5; *see also* doc.40 ¶¶ 5-7, 13-14.)  Jaffe testified:

> [W]e learned an incredible amount of impeaching information that we believed
> would have shown Mr. Rhodes to be completely unreliable.  We also sent
> numerous subpoenas to numerous facilities where Rhodes had been
> incarcerated to obtain information about him.  However, we still had the gun
> cases to contend with, and we still had the problem of the fact that Mr. Rhodes
> and Mr. Stovall were together armed with a shotgun and a mask about a block
> or so from the alleged victim's home, when the arrest occurred.

(Doc. 107, Ex. A at 5.)  Moreover, Jaffe testified that petitioner had declined his suggestion to hire his investigator and that petitioner had hired an investigator from Anniston.  (*Id*. at 4.)  The court finds that the investigative actions of petitioner's attorneys, in light of the information known at the time, was not unreasonable.

Also, considering the evidence as a whole, and assuming Rhodes's credibility could be destroyed, the court finds that evidence against petitioner was overwhelming nevertheless, and, therefore, petitioner cannot show that he was prejudiced by the alleged unreasonable investigation by his attorneys.

Petitioner confessed in open court to hiring Rhodes to kill Jackson and to being a felon in possession of a firearm.  (Doc. 43 at 28.)  The government's proffered evidence,

excluding Rhodes's testimony, shows that petitioner contacted Rhodes in Georgia and asked him to come to Alabama to do a job. (*Id*. at 23-24.) The two men were observed sitting in Rhodes's truck at a convenience store at the same time Jackson was seen approaching the store. (*Id*. at 24.) Petitioner was observed retrieving a mask, a rifle, and a pouch from his car, and, shortly thereafter, Rhodes and petitioner were stopped one block from Jackson's home with a rifle and a mask. (*Id*. at 24-26.) Although he states that he has maintained his innocence throughout all proceedings, (doc. 103 at 6), this assertion is contradicted by his sworn testimony and the statements of his trial attorneys.

The Supreme Court has held:

> [T]he representations of the defendant, his lawyer, and the prosecutor at such a [plea] hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible.

*Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977)(citations omitted). Therefore the court dismisses petitioner's declarations of his innocence as wholly incredible.

The court finds that the attorneys were not incompetent in failing to conduct additional investigation and that any alleged failure to investigate did not prejudice petitioner.

## 2.  Failure to Compel Discovery

Petitioner contends that his attorneys were ineffective because they "failed[ed] . . . to object to . . . the prosecutor's intentional withholding of material exculpatory/impeachment

evidence concerning the main prosecution witness [Rhodes]."  (Doc. 103 at 28.)  He also claims that his attorneys were ineffective because they "fail[ed] to compel discovery . . . with respect to the information going directly to Rhodes['s] credibility about which the prosecutor raised a 'red flag' and about Shifflet and the other suspects in the 404(b) crimes about which he testified."  (*Id.* at 29.)

Counsel for petitioner outlined its discovery efforts on behalf of petitioner in a Motion to Set Aside the Plea.  (Doc. 40; doc. 42.)  According to the attorneys' statements, they acted reasonably regarding their discovery efforts on behalf of petitioner.  (Doc. 40, Exs. 4 and 6; doc. 42, Ex. 7.)  They filed appropriate discovery requests, (doc. 40 ¶ 6), as well as contacting the Assistant U.S. Attorney by letter and in person. (*id.* ¶¶ 7, 10, 13, 14).

The court finds that petitioner has failed to demonstrate that his counsel acted incompetently.  Also, because his trial attorneys were aware that Rhodes was "completely unreliable," (doc. 107 at 5), and proceeded accordingly, any alleged lack of discovery with regard to additional impeachment evidence as to Rhodes was not prejudicial to petitioner.

As to Shifflet, the court held that petitioner was not entitled to impeachment evidence regarding Shifflet until after he had testified at the 404(b) hearing.  (Doc. 81, Ex. B at 51.)  It instructed the government to produce the NCIC file on Shifflet at the 404(b) hearing.  (*Id.* at 51-52.)  Also, petitioner's attorneys questioned Shifflet about his apprehension by

10

petitioner,[4] his deals with the government, and his extensive drug use at the 404(b) hearing, (*id*. at 34-50), and they revisited these issues at the sentencing hearing, (doc. 44 at 30). Although the court denied petitioner's motion for a continuance, made at the 404(b) hearing, it left open the possibility of a continuance after counsel received the government's information on Shifflet.  (Doc. 81, Ex. B at 52.)  On the day of the 404(b) hearing, petitioner decided to plead guilty after the court indicated that evidence of Hurst's disappearance and possible murder would probably be admitted at trial.  (Doc. 41, Ex. 5.)  Therefore, any impeachment evidence to which petitioner would have been entitled was either already known to petitioner and his attorneys or was mooted by his decision to plead guilty.

The court finds that petitioner's counsel did not act incompetently and that he cannot show he has been prejudiced.

---

[4]Shifflet testified that he had stabbed a man in the parking lot of the club petitioner owned.  (Doc. 81, Ex. B [transcript of 404(b) hearing held on December 5, 1997] at 19, 30, 35.)  Petitioner and another man, "Monkey" Adams, had handcuffed Shifflet and taken him to petitioner's home.  (*Id*. at 30, 36-38.)  Shifflet testified he believed petitioner was going to kill him; he testified:

> Jackie and them put handcuffs on me, was going to kill me, but he – somebody at the bar called him and told him that they had seen him and Monkey put me in his car taking me to jail, so he couldn't kill me then because then it would get out in public that I was dead, and they had seen him and Monkey put me in his car.

(*Id*. at 30.)

### 3.  Advice with Respect to Guilty Plea

Petitioner contends that "he has maintained all along . . . that he is not guilty of any crime charged against him[5] and . . . that he had many meritorious defenses and a lot of evidence and witnesses to offer both to confront the government's case and to offer on his own behalf."  (Doc. 103 at 36 [footnote added].)  Therefore, he contends that he would not have pled guilty but for the erroneous advice of his attorneys.

At his plea hearing, petitioner admitted that he had hired Rhodes, who was in Georgia at the time, to come to Alabama to kill Jackson.  He also admitted that he had possession of a rifle and that he was a felon.  At his sentencing hearing, petitioner's counsel denied that he was going to kill Jackson himself, while admitting that he had hired Rhodes for that job. (Doc. 44 at 6; *id*. at 9 ["[H]e accepted responsibility for hiring Mr. Rhodes, but not that he personally was going to commit that murder."].)  Also, counsel stated that petitioner's motivation for hiring Rhodes to kill Jackson was not burglary of his house; rather, he thought Jackson had threatened his family.  (*Id*. at 25-26; *see also id*. at 30 [petitioner stated that the case "involved extortion," but that he was "not saying [he] didn't do wrong"].)  At the plea hearing, at the sentencing hearing, and in the Affidavit attached to his Motion to Set Aside Plea, petitioner never denied hiring Rhodes to come to Alabama to murder Jackson or that

---

[5]The court has dismissed petitioner's declaration of his innocence as wholly incredible. See, *supra*, pp. 8-9.

he was a felon in possession of a firearm.  The record contains no evidence that petitioner told his trial counsel that he was innocent.

Counsel fully explained the benefits and risks of accepting the plea agreement and pleading guilty.  (Doc. 40, Exs. 4-6.)  At the plea hearing, this court informed petitioner of the rights he was giving up by pleading guilty.  (Doc. 43.)  Under the circumstances, the court finds that counsel acted reasonably in recommending petitioner accept the plea agreement.

Moreover, given the record concerning petitioner's guilt for the offenses to which he pled guilty, the other charges against him that were dismissed as part of the plea agreement, and petitioner's extensive criminal history, the court finds no prejudice resulting from any alleged incompetent advice from his attorney regarding the advisability of a plea.

### 4.  Failure to Move to Withdraw Plea of Guilty Before Sentencing

Petitioner contends that –

> he told the lawyers when they presented him with the plea agreement that he could not plead to the crime charged, as he was not guilty of them.[6]  He then succumbed to their pressure and followed their directions during the plea colloquy; but immediately afterwards, and, significantly, at a time when they were still assuring him that he would be sentenced to no more than 90 months, he demanded that they immediately file a motion to withdraw the plea – before any sentencing or any further time passed.  They simply rejected his demands, strung him along by convincing him that they were "working on it," etc.; but they never filed the motion until after sentencing embarrassed them and proved their assurances to Mr. Stovall to have been wrong.

---

[6]As noted above, the court has dismissed as wholly incredible petitioner's statements of his innocence.  See, *supra*, pp. 8-9.

Because the lawyers failed to follow Mr. Stovall's instructions to file the motion to withdraw the plea immediately after the plea was entered and **before** sentencing, he has been prejudiced by being subjected to a different, harsher legal standard for the motion to withdraw and to different factual considerations.[7]

(Doc. 103 at 40 [emphasis in original; internal citations omitted; footnotes added].)

The court notes that petitioner never indicated or hinted at the fact that he wished to withdraw his plea until after the sentencing hearing when the court indicated that it would impose a sentence upward from the guideline sentence in the presentence report. The court

---

[7]The court notes that the current Rule 11 (d) and (e) of the Federal Rules of Criminal Procedure distinguish between a motion to withdraw a guilty plea made before sentencing and one made after sentencing:

(d)   Withdrawing a Guilty or Nolo Contendere Plea.  A defendant may withdraw a plea of guilty or nolo contendere:

(1)  before the court accepts the plea, for any reason or no reason; or

(2)  after the court accepts the plea, but before it imposes sentence if:

(A)  the court rejects a plea agreement under Rule 11(c)(5); or
(B)  the defendant can show a fair and just reason for requesting the withdrawal.

(e)  Finality of a Guilty or Nolo Contendere Plea.  After the court imposes sentence, the defendant may not withdraw a plea of guilty or nolo contendere, and the plea may be set aside only on direct appeal or collateral attack.

However, at the time petitioner entered his guilty plea, withdrawal of a plea of guilty was governed by Fed. R. Crim. P. 32(e), which stated, "If a motion to withdraw a plea of guilty . . . is made before sentence is imposed, the court may permit the plea to be withdrawn if the defendant shows any fair and just reason." *United States v. Hyde*, 520 U.S. 670, 678 (1997)(quoting Fed. R. Crim. P. 32(e)).

finds that petitioner's statement that he "demanded" counsel move to withdraw his guilty plea after it was entered are called into question by his sworn statements and the sworn statements of his attorneys made at the time of, or shortly after, the sentencing hearing.  (*See* doc. 44; doc. 40, Exs. 4, 6; doc. 42, Ex 7; doc.107, Ex. A at 3.)  From the record and from the referenced statements, it appears that petitioner and his counsel were satisfied with the plea until the court departed upward from the guideline sentence.[8]

The court finds that counsel's delay in filing a Motion to Withdraw Plea until after sentencing was reasonable and did not prejudice petitioner.   Moreover, even if the Motion had been made before sentencing, petitioner has not shown a "fair and just reason" which would warrant granting a Motion to Withdraw Plea.

### 5. Failure to Object to Pre-Sentence Report

Petitioner contends that his lawyers were ineffective because they did not object "to the inappropriate (*ex parte*) 'pressure' put on the probation officer to recommend a sentence far above the sentence agreed upon between the government and the defense (90 months)." (Doc. 103 at 41.)   The probation officer has denied she was pressured to modify the presentence report to produce higher sentencing guideline calculations.  (Doc. 90, Att. A.) The court did not pressure the probation officer.   Moreover, the court's review of the

---

[8]The court later granted petitioner's Motion to Reconsider and reduced his sentence to 108 months, which was within the guideline sentence range.  (Doc. 49.)

presence report indicates that it is an accurate statement of each of the sentencing factors, including the determination that less than three points for acceptance was appropriate.[9]

The court finds counsel's performance was competent with regard to making appropriate objections to the presentence report. Any alleged omission did not prejudice petitioner.

### 6. *Ex Parte* Communications and Agreements

Petitioner contends that his lawyers were incompetent because they engaged in *ex parte* conversations with the court without telling him and without getting his "authorization." (Doc. 103 at 44.) The court finds no legal basis for a determination that petitioner's attorneys were incompetent because they discussed petitioner's potential sentence with the court – with or without petitioner's authorization. The substance of the court's conversations with the lawyers for petitioner and the government are set forth in its Memorandum Opinion accompanying its Order denying the Motion to Withdraw Plea and granting the Motion to Reconsider. (Doc. 48.) Under the facts as outlined in the court's Memorandum Opinion, (*id*.), counsel acted competently in communicating with the court without petitioner's presence or authorization.

The court finds that petitioner suffered no prejudice as a result of his counsel's communication with the court. Although he was not allowed to withdraw his plea, he was

---

[9]The court notes that if petitioner, as he asserts now, had maintained his innocence after he entered his guilty plea, he would have been entitled to zero points for acceptance and a higher guideline sentence.

16

sentenced to a term of imprisonment within the guideline imprisonment range.  According to the plea agreement, and, as petitioner was informed at the plea hearing, the court would not allow petitioner to withdraw his plea on the ground that he was not sentenced to the term of imprisonment recommended by the government.  (Doc. 43 at 5.)  The guideline range determined by the court at sentencing was 97-121 months.  Petitioner was ultimately sentenced to 108 months.  This sentence does not establish that he has been prejudiced by the alleged incompetency of counsel.

### 7.  Failure to File Notice of Appeal

The court notes that petitioner filed a Notice of Appeal and his case was heard and affirmed by the Eleventh Circuit Court of Appeals.  (*See* doc. 79.)  Petitioner argues that:

> he does not claim that he was prejudiced by not being able to prosecute a direct appeal.  Rather he raises this issue to demonstrate yet another area of his proceedings in which his lawyers were willing to undercut his defense by failing to follow his instructions, even at the expense of denying him any and all review of his proceedings.

(Doc. 103 at 47.)  Based on the foregoing, the court finds that petitioner has conceded that he was not prejudiced by a failure to file a notice of appeal.

### 8.  Conflict of Interests

Petitioner contends that Broome, one of his attorneys, had a conflict of interest.  He contends that, at the time he represented petitioner, Broome represented Terry Wayne Willingham, an alleged suspect in the disappearance/murder of Hurst, one of the acts sought to admitted as 404(b) evidence against petitioner.  Petitioner argues:

> At all relevant times to these proceedings, Broome operated under an actual conflict of interest that adversely affected Mr. Stovall and his defense, most directly in relation to the investigation that should have been done regarding the 404(b) matters and in forcing Mr. Stovall to plead guilty, in the best interests of Broome's other client (to avoid having evidence developed that would be damaging to Willingham and to avoid calling Willingham as a witness) and against Mr. Stovall's best interests.

(Doc. 103 at 51.)

With regard to a claim of ineffective assistance of counsel based on an alleged conflict of interest, the Eleventh Circuit has held:

> To obtain relief on a case of this kind, a defendant must show **first**, that his attorney had an actual conflict of interest, and **second**, that the conflict adversely affected counsel's performance. *See Freund v. Butterworth*, 165 F.3d 839, 858 (11th Cir. 1999). In order to establish a violation of the Sixth Amendment, a defendant "must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1981); *see also Freund*, 165 F.3d at 858. A § 2255 petitioner must show "'inconsistent interests and must demonstrate that the attorney made a choice between possible alternative courses of action . . . .'" *McConico v. Alabama*, 919 F.2d 1543, 1546 (11th Cir. 1990)(quoting *Smith v. White*, 815 F.2d 1401, 1404 (11th Cir. 1987)).

> . . .

> [E]ven if an actual conflict of interest exists, there must be proof that the conflict adversely affected counsel's performance in order to rise to the level of a Sixth Amendment violation. *See Buenoano v. Singletary*, 74 F.3d 1078, 1086 (11th Cir. 1996)("In assessing whether an actual conflict adversely affected counsel's representation, '[a] petitioner need not show that the result of the trial would have been different without the conflict of interest, only that the conflict had some adverse effect on counsel's performance.'" (quoting *McConico*, 919 F.2d at 1548)).

> To prove adverse effect, a habeas corpus petitioner must show: (1) the existence of a plausible alternative defense strategy or tactic that might have been pursued; (2) that the alternative strategy or tactic was reasonable under

the facts; and (3) a link between the actual conflict and the decision to forgo the alternative strategy of defense. *See Freund*, 165 F.3d at 860 (holding that a petitioner must establish that the alternative defense strategy was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests); *see also Burden v. Zant*, 24 F.3d 1298, 1305 (11th Cir. 1994). If there is a guilty plea involved, this Court looks at whether the attorney's actual conflict adversely affected the defendant's decision to plead guilty. *See LoConte v. Dugger*, 847 F.2d 745, 755 (11th Cir. 1988).

*Pegg v. United States*, 253 F.3d 1274, 1277-78 (11th Cir. 2001).

The record indicates that petitioner's private investigator, hired by his appellate counsel, saw Willingham in Broome's office on November 11, 1998, (doc. 81, Ex. A, ex. 19 ¶ 6), over eleven months after the 404(b) hearing, (*see id*., Ex. B [transcript of the 404(b) hearing held on December 5, 1997]). There is no direct evidence that Broome represented Willingham at the time of the 404(b) hearing. However, for purposes of this decision, the court assumes that Broome represented Willingham at the relevant time. Nothing in the record indicates that Jaffe or Drennan, petitioner's other attorneys, represented Willingham or had any other potential conflict in their representation of petitioner.

At the 404(b) hearing, Shifflet testified that he and Willingham were going to help petitioner murder Hurst and/or dispose of his body. (*Id*., Ex. B at 24-29.) Contrary to petitioner's statements, the evidence at the 404(b) hearing was that Willingham and petitioner were going to participate in Hurst's murder together; nothing indicated that Willingham was, or arguably could be, an alternative suspect in Hurst's disappearance or that Willingham acted independently of petitioner.

At the 404(b) hearing, Shifflet was questioned by petitioner's attorneys regarding his criminal history and his history of drug addiction.  (*Id.* at 34-50.)  They also questioned him regarding an incident when petitioner took Shifflet to the authorities after he stabbed a man. (*Id.* at 36-38.)  They questioned Shifflet regarding whether Willingham was the one that suggested he help petitioner kill Hurst; to which, Shifflet testified that Willingham had approached him with the plan first but that petitioner had asked him personally to help him get rid of Hurst.  (*Id.* at 40-41.)  Shifflet also testified that he was going "to turn state" on Willingham, but that deal had not been made.  (*Id.* at 48.)

The court finds that the "alternative strategy or tactic" of blaming Willingham for the disappearance and likely murder of Hurst was not reasonable under the facts and that the decision to forego this alternative strategy was not caused by Broome's representation of Willingham, whose connection to the alleged crime was as petitioner's apparent accomplice. The court finds that Broome's presumptive representation of Willingham did not adversely affect petitioner's decision to plead guilty.

**B.   GOVERNMENT WITHHELD MATERIAL EXCULPATORY AND IMPEACHMENT EVIDENCE**

For the reasons set forth above, the court finds that no prejudice resulted from the alleged withholding of impeachment evidence regarding Rhodes or Shifflet.  *Brown v. Head*, 272 F.3d 1308, 1316 (11th Cir. 2001)("If the failure to use certain evidence does not result in prejudice for ineffective assistance purposes, the suppression of some of that same evidence will not be material for *Brady* purposes. With respect to the impeachment evidence

relating to witnesses . . ., that evidence, standing alone, is not material for *Brady* purposes for the same reasons we have explained that counsel's failure to discover and use it was not prejudicial for ineffective assistance purposes."); *see also United States v. Ruiz*, 536 U.S. 622, 629 (2002) (no constitutional requirement for the government to disclose impeachment evidence in advance of a guilty plea).

The court notes the record contains no evidence of withheld exculpatory evidence.

## C. DUE PROCESS AND ASSISTANCE OF COUNSEL VIOLATED BY EX PARTE COMMUNICATIONS

Petitioner objects to "*ex parte* communications" between the court and counsel outside of his presence.   He contends he was prejudiced by being excluded from these communications because "if he had heard anything in any way indicating that there was some question about the 90 months, contrary to what his lawyers had lead him to believe, he could have and would have put a stop to all such proceedings immediately and insisted on gong to trial."  (Doc. 103 at 60.)   According to petitioner's counsel, the *ex parte* communications included the court's statement to counsel that it would not depart above the guideline sentence, but the chances were only 50/50 that it would accept the government recommendation of 90 months.  (Doc. 41, Ex. 4 at 1 and Ex. 6 at 1-2.)  The content of these communications were conveyed to petitioner before he accepted the government's plea agreement and pled guilty.  (*Id.*, Ex. 5.)  Petitioner stated:

> My attorneys explained that in their professional opinion the Judge would not increase the sentence, and certainly not depart upward, where there had been representations to the contrary.

Based on these representations, I decided to accept the Government's offer.  I would never have pled guilty without the assurances given by attorneys concerning the representation of Judge Blackburn.  I would never have given up my rights to a trial by jury if I had any indication that an upward departure was at issue.

(*Id*.)

According to the Supreme Court, a criminal defendant "has the privilege under the Fourteenth Amendment to be present in his own person whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." *Snyder v. Massachusetts*, 291 U.S. 97, 105-06 (1934), *quoted in United States v. Gagnon*, 470 U.S. 522, 526 (1985).  Petitioner's presence during his attorneys' communication with the court had no "relation, reasonably substantial, to the fullness of his opportunity to defend against the charge[s]."  *See id*.  Counsel reported to petitioner the contents of their conversation with the court before petitioner made his decision to pled guilty.  At his guilty plea hearing, petitioner was informed of the court's discretion to reject the plea agreement's recommended sentence and to sentence petitioner based on the guidelines, as determined by the presentence report.  (Doc. 43 at 5, 12.)  The court further stated, "I'm telling you just from what I know that I'm [not inclined] fairly strongly to go along with the plea agreement with regard to where in the guideline range the government is recommending."  (*Id*.)  It also specifically told petitioner that "it's unlikely, given what I know, that I'm going to accept this agreement, but I might.  I think I told your counsel fifty/fifty."  (Doc. 43 at 12.)  Petitioner did not change his mind about pleading guilty when the court told him directly that it would

determine his sentence and that it was not bound by the recommendation of the government.
(*Id*. at 14, 28.)  His failure to be present when similar statements were made to his counsel
cannot be said to have made any difference in his decision to plead guilty.

Petitioner has failed to demonstrate that his due process rights were violated by his
failure to be present during the court's discussion with his counsel.

## D.  RIGHT TO EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Petitioner contends that his appellate counsel was ineffective because she failed to
raise all the issues he thought should be raised and because she failed to make an adequate
record in this court before processing the appeal.

The Supreme Court has established the following standard for determining a claim of
ineffective appellate counsel:

> In *Jones v. Barnes*, 463 U.S. 745, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983), we
> held that appellate counsel who files a merits brief need not (and should not)
> raise every nonfrivolous claim, but rather may select from among them in
> order to maximize the likelihood of success on appeal.  Notwithstanding
> *Barnes*, it is still possible to bring a *Strickland* claim based on counsel's failure
> to raise a particular claim, but it is difficult to demonstrate that counsel was
> incompetent.  *See, e.g., Gray v. Greer*, 800 F.2d 644, 646 (C.A.7 1986)
> ("Generally, only when ignored issues are clearly stronger than those
> presented, will the presumption of effective assistance of counsel be
> overcome").  With a claim that counsel erroneously failed to file a merits brief,
> it will be easier for a defendant-appellant to satisfy the first part of the
> *Strickland* test, for it is only necessary for him to show that a reasonably
> competent attorney would have found one nonfrivolous issue warranting a
> merits brief, rather than showing that a particular nonfrivolous issue was
> clearly stronger than issues that counsel did present.  In both cases, however,
> the prejudice analysis will be the same.

*Smith v. Robbins*, 528 U.S. 259, 288 (2002).

Pursuant to the foregoing discussion of petitioner's other grounds for relief, the court finds that petitioner cannot show prejudice with regard to any alleged incompetent performance of his appellate counsel.

## E.  OBJECTIONS TO DENIAL OF MOTION FOR DISCOVERY AND MOTION FOR BAIL

Based on the foregoing, the court will overrule petitioner's objections to the Magistrate Judge's denial of his Motion for Bail and his Motion for Discovery.  The court finds petitioner's § 2255 Motion to be devoid of arguable merit.  Therefore, petitioner was not entitled to bail pending the decision on his petition or to conduct discovery.

## <u>CONCLUSION</u>

For the foregoing reasons, the court is of the opinion that petitioner's Motion for Reconsideration of Memorandum Opinion and Order and for Stay and Other Relief, (CV 02-B-8036-E, doc. 4), is due to be granted, and the court has reconsidered its Memorandum Opinion and Order that petitioner file an Amended Motion to Vacate, Set Aside, or Correct Federal Sentence, (CV 02-B-8036-E, doc. 2.)

The court's Memorandum Opinion and Order, (*id*.), will be vacated.  As set forth above, the court has considered petitioner's  Motion to Vacate, Set Aside, or Correct Federal Sentence Pursuant to 28 U.S.C. § 2255, (doc. 81), and finds the Motion is due to be denied. Petitioner's objections to the denial of his requests for bail and discovery will be overruled.  An Order in conformity with this Memorandum Opinion will be entered contemporaneously.

**DONE**, this the 26th day of March, 2007.

Sharon Lovelace Blackburn

SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE